B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET** (Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER** (Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>Meidu America, Inc. | **DEFENDANTS**<br>See attached list |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Jarrod B. Martin, Chamberlain Hrdlicka<br>1200 Smith Street, Suite 1400, Houston, TX 77002<br>Phone: 713-356-1280 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Declaratory Judgment
Dismissal of Bankruptcy Case, 11 U.S.C. § 1112

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ 0.00 |

Other Relief Sought

Dismissal of Bankruptcy Case, 11 U.S.C. § 1112

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>MD America Energy, LLC, et al | BANKRUPTCY CASE NO.<br>20-34966 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>David R. Jones |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Jarrod B. Martin | | |
| DATE<br>11/3/2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Jarrod B. Martin on behalf of Meidu America, Inc. | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an “estate” under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor’s discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court’s Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff’s attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**DEFENDANTS**

1. MD AMERICA ENERGY HOLDINGS, INC.,
2. MD AMERICA INTERMEDIATE HOLDINGS, LLC,
3. MD AMERICA HOLDINGS, LLC,
4. MD AMERICA ENERGY, LLC,
5. MD AMERICA PIPELINE, LLC,
6. MD AMERICA FINANCE CORPORATION,
7. MC CREDIT FUND I LP,
8. MC CREDIT IA LP,
9. MC CREDIT FUND II LP,
10. MC CREDIT FUND III (DELAWARE) LP,
11. MC CREDIT FUND III-U (DELAWARE) LP,
12. MC CREDIT FUND III LP,
13. ARENA LIMITED SPV, LLC,
14. TAO TALENTS, LLC,
15. TPG SPECIALTY LENDING, INC., K/N/A SIXTH STREET SPECIALTY LENDING, INC.
16. PRUDENTIAL LEGACY INSURANCE COMPANY OF NEW JERSEY,
17. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
18. LOAN ADMIN CO., LLC,
19. MD ADMIN CO., LLC
20. ROBERT WARSHAUER, and
21. DONALD RITTER

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **MD America Energy, LLC, et al.**[1]**,** | § | **Case No. 20-34966 (DRJ)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |

| | | |
|---|---|---|
| **MEIDU AMERICA, INC.** | § | |
| | § | |
| **v.** | § | **Adversary No. ____________** |
| | § | |
| **MD AMERICA ENERGY HOLDINGS, INC.,** | § § | |
| **MD AMERICA INTERMEDIATE HOLDINGS, LLC,** | § § | |
| **MD AMERICA HOLDINGS, LLC,** | § | |
| **MD AMERICA ENERGY, LLC,** | § | |
| **MD AMERICA PIPELINE, LLC,** | § | |
| **MD AMERICA FINANCE CORPORATION,** | § § | |
| **MC CREDIT FUND I LP,** | § | |
| **MC CREDIT IA LP,** | § | |
| **MC CREDIT FUND II LP,** | § | |
| **MC CREDIT FUND III (DELAWARE) LP,** | § § | |
| **MC CREDIT FUND III-U (DELAWARE) LP,** | § § | |
| **MC CREDIT FUND III LP,** | § | |
| **ARENA LIMITED SPV, LLC,** | § | |
| **TAO TALENTS, LLC,** | § | |
| **SIXTH STREET SPECIALTY LENDING, INC.,** | § § | |
| **PRUDENTIAL LEGACY INSURANCE COMPANY OF NEW JERSEY,** | § § | |
| **THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,** | § § | |
| **LOAN ADMIN CO., LLC,** | § | |

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: MD America Energy, LLC (0164), MD America Energy Holdings, Inc. (5493), MD America Intermediate Holdings, LLC (3204), MD America Holdings, LLC (5478), MD America Pipeline, LLC and MD America Finance Corporation (8321). Debtors' headquarters is: 301 Commerce Street, Suite 2500 Fort Worth, Texas 76102.

**MD ADMIN CO., LLC** §
**ROBERT WARSHAUER, and** §
**DONALD RITTER** §

---

## COMPLAINT

MeiDu America, Inc. ("**MeiDu America**"), a creditor and party-in-interest in this jointly-administered bankruptcy case files its Adversary Complaint ("**Complaint**") against the above-captioned parties ("**Defendants**"), and would respectfully show as follows:

## JURISDICTION, VENUE AND CONSENT

1. The Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and in accordance with Southern District of Texas General Order 2012–6.[2] This matter is both a core- and non-core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O), and § 157(c)(1), because not only does the Complaint raise concerns about the fundamental question of whether the bankruptcy filing was appropriate, it also raises concerns regarding state law issues as well.

2. The bases for the relief requested herein are §§ 105(a), and 1112 of title 11 of the Bankruptcy Code, Rule 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure ("**Rules**"), and Rule 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas ("**Bankruptcy Local Rules**").

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. While under *Stern v. Marshall*[3] MeiDu America's position is that the Court lacks authority under Article III of the United States Constitution to enter final judgment on some or all of MeiDu America's claims, pursuant to BLR 7008-1, MeiDu America consents to the entry of final orders or judgment by Court if it is determined that the Court, absent consent of the parties,

---

[2] *In re*: *Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).
[3] 564 U.S. 462 (2011).

cannot enter final orders or judgment consistent with Article III.

## THE PARTIES

5. Plaintiff MeiDu America is a corporation organized and existing under the laws of the State of Delaware. MeiDu America may be served in this adversary proceeding through the undersigned counsel.

6. Defendant MD America Energy Holdings, Inc. ("**MDA Energy Holdings**") is a corporation organized and existing under the laws of the State of Delaware and may be served through its registered agent Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

7. Defendant MD America Intermediate Holdings, LLC ("**MDA Intermediate**") is a limited liability company organized and existing under the laws of the State of Delaware and may be served through its registered agent Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

8. Defendant MD America Holdings, LLC ("**MDA Holdings**") is a limited liability company organized and existing under the laws of the State of Delaware and may be served through its registered agent Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

9. Defendant MD America Energy, LLC ("**MDA Energy**") is a limited liability company organized and existing under the laws of the State of Delaware and may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

10. Defendant MD America Pipeline, LLC ("**MDA Pipeline**") is a limited liability company organized and existing under the laws of the State of Texas and may be served through

its registered agent, MD America Energy, LLC, 301 Commerce Street, Suite 2150, Fort Worth, TX 76102.

11. Defendant MD America Finance Corporation ("**MDA Finance**") is a corporation organized and existing under the laws of the State of Delaware The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

12. MDA Energy, MDA Intermediate, MDA Holdings, MDA Energy, MDA Pipeline, and MDA Finance will be collectively referred to as the "**Debtors**" or "**MeiDuSubs.**"

13. Defendant MC Credit Fund I, LP is a limited partnership, which on information and belief, is duly organized and existing under the laws of the State of Delaware, and may be served in this adversary proceeding through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

14. Defendant MC Credit IA, LP is a limited partnership, which on information and belief, is duly organized and existing under the laws of the State of Delaware, and may be served in this adversary proceeding through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

15. Defendant MC Credit Fund II, LP is a limited partnership, which on information and belief, is duly organized and existing under the laws of the State of Delaware, and may be served in this adversary proceeding through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

16. Defendant MC Credit Fund III (Delaware), LP is a limited partnership, which on information and belief, is duly organized and existing under the laws of the State of Delaware, and may be served in this adversary proceeding through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

17. Defendant MC Credit Fund III-U (Delaware), LP is a limited partnership, which on information and belief, is duly organized and existing under the laws of the State of Delaware, and may be served in this adversary proceeding through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

18. Defendant MC Credit Fund III, LP is a limited partnership, which on information and belief, is duly organized and existing under the laws of the State of Delaware, and may be served in this adversary proceeding through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

19. Defendant Arena Limited SPV, LLC is a limited liability company organized and existing under the laws of the State of Delaware and may be served through its registered agent VCorp Services, LLC, 1013 Centre Road, Suite 403-B, Wilmington, DE 19805.

20. Defendant TAO Talents, LLC is a limited liability company organized and existing under the laws of the State of Delaware and may be served through its registered agent Maple Fiduciary Services (Delaware) Inc., 4001 Kennett Pike, Suite 302, Wilmington, DE 19807.

21. Defendant TPG Specialty Lending, Inc., k/n/a Sixth Street Specialty Lending, Inc. is a corporation organized and existing under the laws of the State of Delaware and may be served through its registered agent Maple Fiduciary Services (Delaware) Inc., 4001 Kennett Pike, Suite 302, Wilmington, DE 19807.

22. Defendant Prudential Legacy Insurance Company of New Jersey is a corporation organized and existing under the laws of the State of New Jersey and may be served through its registered agent Carl A. Peterson, 23 Main Street, Holmdel, NJ 07102.

23. Defendant The Prudential Insurance Company of America is a corporation organized and existing under the laws of the State of New Jersey and may be served through its

registered agent Margaret M. Foran, 751 Broad Street, Newark, NJ 07102.

24. MC Credit Fund I, LP, MC Credit IA, LP, MC Credit Fund II, LP, MC Credit Fund III (Delaware), LP, MC Credit Fund III-U (Delaware), LP, MC Credit Fund III, LP, Arena Limited SPV, LLC, TAO Talents, LLC, Sixth Street Specialty Lending, Inc., Prudential Legacy Insurance Company of New Jersey, and The Prudential Insurance Company of America will collectively be referred to as the "**Lenders**."

25. Defendant Loan Admin Co., LLC is a limited liability company organized and existing under the laws of the State of Delaware and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808.

26. Defendant MD Admin Co., LLC is a limited liability company organized and existing under the laws of the State of Delaware and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808.

27. Defendant Robert Warshauer is a New York resident and can be served at 370 Fairhaven Boulevard, Woodbury, NY 11797-1628.

28. Defendant Donald Ritter is a Texas resident and can be served at 3517 Pinehurst Circle, Dallas, TX 75234.

## PRELIMINARY STATEMENT

29. On October 12, 2020, Lenders' agents (acting as putative directors and officers of Debtors) filed multiple chapter 11 bankruptcy petitions with the United States Bankruptcy Court, Southern District of Texas, Houston Division (the "**Bankruptcy Court**").[4] However, Lenders and their agents filed these petitions without the requisite authority and in blatant violation of the Uniform Commercial Code ("**UCC**") and federal public policy.

[4] *See* ECF No. 1.

30. After a default under the Lenders' loan documents, the Lenders illegally and improperly appointed captive directors to the Debtors' board of directors and took control of the Debtors' business. As the owner of the equity in and to the Debtors, MeiDu America sued to stop such actions in New York state court. During the suit, Lenders caused the captive boards of directors to authorize and file chapter 11 with the Bankruptcy Court in order to dispose of the collateral in a manner that would not otherwise be permitted under state law. These same Lenders seek to utilize the chapter 11 filing as a means to divest MeiDu America's controlling interest in Debtors and the real debtors-in-interest from protections otherwise afforded by the bankruptcy process. Thus, cause exists to dismiss the bankruptcy cases pursuant to § 1112(b)(1) of the Bankruptcy Code.

## STATEMENT OF RELEVANT FACTS

### A. History of the Bankruptcy

31. On October 12, 2020, the Debtors filed for bankruptcy protection under Chapter 11 without the requisite authority. The Lenders took such actions as a means to obstruct MeiDu America's legitimate controlling interest in Debtors.

32. This bankruptcy case was filed with a pre-packaged plan (the "**Plan**").[5] Prepetition, MDA Energy—as borrower—and certain other debtor entities—as guarantors—entered into a prepetition term loan agreement with the Lenders. As a part of the Plan, those Lenders will hold an allowed claim in the amount of $117,849,544.40.

33. The Plan contemplates that a "Restructuring Transaction" will take place to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' (defined below) respective businesses and/or the overall corporate/entity structure of each debtor. The details of the

[5] ECF No. 22.

Restructuring Transaction are contained within the Restructuring Support Agreement (the "**RSA**").[6] The Plan represents that MDA Energy will be an "Acquired Entity" following consummation of the RSA, although it leaves open the possibility of another debtor entity serving as the "Acquired Entity." The Reorganized Debtors will enter into new organizational documents with new boards, and equity in the Acquired Entity will be distributed to the holders of Class 4 Prepetition Term Loan Claims, as described below:

| **Class** | **Claim or Interest** | **Status** | **Entitled to Vote** |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Secured Tax Claims | Unimpaired | No (Deemed to Accept) |
| 4 | Prepetition Term Loan Claims | Impaired | Yes |
| 5 | Trade Claims | Unimpaired | No (Deemed to Accept) |
| 6 | Paycheck Protection Loan Claims | Unimpaired | No (Deemed to Accept) |
| 7 | General Unsecured Claims | Impaired | No (Deemed to Reject) |
| 8 | Section 510 Claims | Impaired | No (Deemed to Reject) |
| 9 | Intercompany Claims | Unimpaired/Impaired | No (Deemed to Either Accept or Reject) |
| 10 | Intercompany Interests | Unimpaired/Impaired | No (Deemed to Either Accept or Reject) |
| 11 | MD America Energy Holdings, Inc | Impaired | No (Deemed to Reject) |

34. Tellingly, only the Lenders—as holders of Class 4 claims—will vote on the Plan.

---

[6] The RSA describes certain conditions that need to be met in order for the agreement to become effective, including the payment to the Lenders an aggregate amount of $9,500,000 and the termination of a certain "Transaction Bonus Plan" of MDA Energy. Certain milestones must be reached during the course of the bankruptcy, including entry of final Cash Collateral Order and a final Hedging Order. A Confirmation Order must be entered within 45 days of the Petition Date, and the Effective Date must occur within 15 days after the Confirmation Date.

The Lenders agreed to certain conditions, including but not limited to, voting in favor of the Plan and agreeing not to take any action that would impede or interfere with the confirmation of the Plan or consummation of the Restructuring Transactions or propose any alternative restructuring plan, while the Debtors agreed to certain commitments, including but not limited to, confirming the Plan, consummating the Restructuring Transaction and not objecting to the claims held by the Lenders (and affirmatively seek dismissal of any pending legal proceeding brought by or on behalf of any company parties, directly or derivatively, that are inconsistent with the releases in favor of the Lenders).

The Lenders have the ability to terminate the Agreement upon the occurrence of certain "terminating events," including but not limited to, the failure to meet a milestone, the Plan Effective Date not occurring by 12/15/20, termination of the debtor's authority to use cash collateral, the failure to consummate the Restructuring Transactions, the "Consenting Term Lenders" representing less than 2/3 of the total outstanding amount of the Term Loan Claims for a period of 7 business days, or the Debtors enters into a definitive agreement with respect to an alternative restructuring. The Debtors have the ability to terminate the Agreement upon the occurrence of certain terminating events, including but not limited to conversion of the case to a chapter 7, the breach by one or more of the Consenting Term Lenders of any of the undertakings or reps and warranties contained in the Agreement, or the Plan Effective Date not occurring on or before 60 days after 12/15/20.

No other class is entitled to vote. The Debtors are releasing any causes of action they hold against the Lenders in exchange for the use of cash collateral. Notably, the consent of the "Required Consenting Term Lenders" (defined as Consenting Term Lenders holding at least 3/4 of the total aggregate outstanding principal amount of the Prepetition Term Loan Claims) is required prior to certain payments being made under the Plan, or certain executory contracts being rejected or assumed under the Plan.

35. Following consummation of the RSA, MDA Energy, MDA Energy Holdings, MDA Intermediate, MDA Holdings, MDA Pipeline, and MDA Finance (or any successors thereto, including the Acquired Entity) (collectively, the "**Reorganized Debtors**") will enter into a "New First Lien Term Loan" in the amount of $60 million with the Prepetition Term Lenders. This "New First Lien Term Loan" is not sufficient to cover all that may be owed to the Lenders, so the prepetition term lenders will hold a deficiency claim, which will ultimately be classified as Class 7 General Unsecured Claims.

**B. History of the Dispute Between MeiDu America and Lenders (and Lenders' agents)**

36. Since at least November 18, 2018, MeiDu America maintained, and continues to maintain, complete ownership over the Debtors through a top-down governance structure as follows: (a) the sole shareholder of MDA Energy Holdings is MeiDu America; (b) the sole member of MDA Intermediate is MDA Energy; (c) the sole member of MD Holdings is MDA Intermediate; (d) the sole member of MDA Energy is MDA Holdings; (e) the sole member of MDA Pipeline is MDA Energy; and (f) the sole member of MDA Finance is MDA Energy.

***i. MeiDu America obtained financing for the MeiDuSubs from the Lenders***

37. On November 18, 2018, the MeiDuSubs executed a variety of lending documents with Loan Admin Co., LLC ("**Loan Admin Co.**") (otherwise referred to in the documents as the

"**Administrative Agent,**" "**Collateral Agent**" and "**Pledgee**"), Guggenheim Securities, LLC ("**Guggenheim**"), and the Lenders (collectively, the MeiDuSubs, Loan Admin Co., Guggenheim and the Lenders will be the "**Credit Agreement Parties**") in order to borrow $130 million in connection with MeiDuSubs' oil-and-gas business. These documents included a Credit Agreement, Security Agreement, Pledge Agreement, Subsidiaries Guaranty, Grant of Security Interest, certain deeds of trust, and various notes with the Lenders.[7]

38. At the same time, MeiDu America, as the pledgor, entered into a separate pledge agreement ("**Parent Pledge Agreement**") with Loan Admin Co., as the pledgee, pledging, *inter alia*, "a continuing security interest in favor of [Loan Admin Co.] for the benefit of secured creditors in all of its right, title and interest in . . . all securities with respect to Equity Interests in Holdings and any Succeeding Person thereto owned or held by [MeiDu America] from time to time."[8] In effect, the Parent Pledge Agreement resulted in MeiDu America pledging all of its ownership interest in the MeiDuSubs as collateral for the loan.

39. The parties to the Parent Pledge Agreement set forth certain specified remedies should an "Event of Default" occur. Specifically, Loan Admin Co. is entitled, on behalf of Lenders, to "exercise all the rights and remedies of a secured party under the UCC as in effect in any relevant jurisdiction." The agreement thereafter defined various specific remedies in pursuit of the Lenders' rights and remedies under the UCC. However, none of the agreements expressly authorized Loan Admin Co. to cause the MeiDuSubs to file bankruptcy or dispose of collateral in a manner other than a commercially reasonable sale.

40. The "Credit Agreement" (to which the other documents refer to for the relevant

---

[7] *See* Ex. A, Verified Complaint, *MeiDu Energy Corp., et al v. MC Credit Fund I, LP, et al,* in the Supreme Court of the State of New York, County of New York, Attachments A-F, attached hereto and incorporated by referenced herein.

[8] S*ee* Ex. B, Pledge Agreement, attached hereto and incorporated by reference herein.

governing law) provides that New York state law applies to any legal actions between the parties.

***ii. Lenders created a dispute over the MeiDuSubs' compliance with certain loan covenants resulting in an amendment to the Credit Agreement***

41. In the summer of 2019, the Lenders began an effort using their economic power to force the MeiDuSubs to pay down a substantial portion of the loan early by contesting the MeiDuSubs' reserve reports. Following a contentious effort to resolve the issue, on December 20, 2019, the Credit Agreement Parties entered into the First Amendment to the Credit Agreement ("**First Amendment**"), which provided that the MeiDuSubs would pay an amount of not less than $30,000,000 on or before March 31, 2020, of which failure to do would result in a default.[9] MeiDu America did not sign the First Amendment or otherwise acknowledge a change to the Pledge Agreement.

***iii. Lenders claim default and purport to take over control of the MeiDuSubs without further notice***

42. After executing the First Amendment, Lenders (through Loan Admin Co.) repeatedly sought to inject themselves into the business decisions of the MeiDuSubs. Upon information and belief, Lenders' actions sought to force the MeiDuSubs to pay the entire notes off early despite the recent concessions. Lenders' actions only escalated as the effect from the global pandemic of COVID-19 became more pressing. The MeiDuSubs continued to make all payments under the loans and remained current on all payments up until March 31, 2020, when the $30,000,000 payment came due.

43. Due to the global pandemic of COVID-19, in combination with global geopolitical events, the MeiDuSubs were unable to make the $30,000,000 payment or obtain the refinancing necessary to satisfy Lenders by March 31, 2020, despite tremendous efforts to do so.

[9] *See* Ex. A, Attachment F.

44. The Lenders then continued their aggressive and unyielding efforts to gain control over the assets of the Debtors. On April 1, 2020, Loan Admin Co., on behalf of the Lenders, began taking actions to seize control of the MeiDuSubs:

(a) Lenders and the Administrative Agent appointed MD Admin Co., LLC ("**Sub-Agent**") to act on its' behalf, and as directed by the Lenders, under the Credit Agreement and related documents. Upon information and belief, Sub-Agent was at all times controlled and operated by the same personnel as Loan Admin Co. The Lenders instructed Sub-Agent to deliver a notice of default and begin acting to enforce Lenders' purported rights and remedies.

(b) The Administrative Agent and Sub-Agent sent a letter to MeiDu America and MeiDuSubs claiming that an event of default occurred under the First Amendment and they intended to invoke certain remedies. The Lenders claimed the right to exercise the voting power of MeiDu America, and to act as the attorney-in-fact for MeiDu America with respect to operating the MeiDuSubs. Notably, Lenders did not accelerate any note, provide notice of strict foreclosure, or otherwise claim that they intended to take possession of or dispose of any collateral.

(c) Sub-Agent, "in its capacity as attorney-in-fact of [MeiDu America]" without notice or warning signed a written consent removing all of the members of the various boards of directors of the MeiDuSubs, claiming in the resolution that it "was in the best interests" of each company without further explanation. Replacing the boards of directors was not authorized or permitted under the Parent Pledge Agreement. Then, Sub-Agent simultaneously appointed Robert Warshauer and Donald Ritter to take control of each of the MeiDuSubs. The grant of authority to Warshauer and

Ritter purportedly gave them total control over the MeiDuSubs until their disqualification, death, resignation or removal by the Sub-Agent. In this appointment, the Sub-Agent failed to place limits on Warshauer and Ritter to act only in accordance with Lenders' authority under the loan documents or applicable law. In effect, Lenders granted or delegated authority to Warshauer and Ritter that they themselves did not possess. Without delay, Warshauer and Ritter accepted the appointment on the same day. Upon information and belief, Sub-Agent handpicked these individuals due to their lack of independence and with the understanding they would act in the Lenders' interest above all else.

45. On April 2, 2020, MeiDu America, upon learning of the Lenders' actions, immediately contested the Lenders' authority (directly or through their agents) to terminate and replace the boards and officers of the MeiDuSubs and requested that they cease and desist such illegitimate attempts to seize control.

46. The Lenders and their agents ignored the requests, locked certain employees out of the company, barred access to electronic systems, and further refused to explain why such conduct was in the "best interest" of the companies. Other than the default over the balloon payment, the company continued to financially perform during this difficult period.

47. While not at issue in this action, upon information and belief, Lenders' actions through their agents resulted in the withholding of critical information from MeiDu America (and thereby MeiDu Energy Corporation's auditors) needed as part of public financial reporting obligations in order to drive down the market value of the parent corporation, MeiDu Energy Corporation, and further pressurize the situation to negotiate substantial concessions towards a

pay-down or pay-off of the debt.[10] These actions drove down the share price considerably, resulting in MeiDu Energy Corporation being subjected to a de-listing process on the Shanghai Exchange and its investors suffering losses of hundreds of millions of dollars.

***iv. Lenders' Sub-Agent intentionally scared off bidders and impeded substantial efforts from Zhongzhi Enterprise Group to pay off loans***

48. MeiDu America made substantial efforts to cure the default and facilitate payment to the Lenders. It procured significant interest from Zhongzhi Enterprise Group ("**ZE Group**"), a private wealth management company with assets under management exceeding $100 billion, to satisfy the Lenders while still leaving MeiDu America with some ownership in the MeiDuSubs.[11]

49. Upon information and belief, ZE Group approached Sub-Agent with substantial offers to satisfy Lenders' demands for payment and put the companies back into good standing. Sub-Agent acted grossly unprofessional during these negotiations in order to circumvent further efforts of ZE Group to purchase the assets (even while knowing that it owed a duty to dispose of the collateral in a commercially reasonable manner). Undoubtedly, this played a role in Lenders' decision not to move forward with a public sale and to instead pursue a different direction—one which would result in Lenders owning outright the momentarily-depressed assets based on extreme market conditions rather than permitting a commercially reasonable public bidding process following a recovery.

50. Following the breakdown of negotiations, MeiDu America instructed Haixio "Jimmy" Shao to correct the Lenders' illegitimate conduct and undo the company actions purportedly taken by Sub-Agent. On June 16, 2020, the MeiDuSubs (through Jimmy Shao) executed written consents passing resolutions to reject the Sub-Agent's illegitimate and invalid

[10] *See* Ex. A, ¶¶ 47-53.
[11] *See id.*, ¶¶ 54-57.

actions.

### *v. MeiDu America seeks protection in New York State Court*

51. On June 24, 2020, MeiDu America (along with MeiDu Energy Corporation) filed a Verified Complaint in the Supreme Court of the State of New York, County of New York, seeking a declaratory judgment that Lenders' and their agents' actions violated Article 9 of the Uniform Commercial Code ("**Article 9**") and the Pledge Agreements were unenforceable to the extent that they circumvented the protections afforded under Article 9. Additionally, they sought claims of conversion, breach of fiduciary duty, discharge of debt, and set-off of debt. They also moved for injunctive relief seeking protection from the Lenders' egregious conduct ("**New York Complaint**").[12] The New York Complaint names the MeiDuSubs as nominal defendants.

52. On July 8, 2020, the court denied preliminary injunctive relief. The interlocutory order is currently on appeal and the action remains pending.

### *vi. Lenders authorized the captive boards to pursue bankruptcy in order to take control of the assets for themselves outside of the procedures required by Article 9*

53. While the New York state litigation remained pending, Lenders conceived of a plan to gain control of the assets and circumvent the protections afforded under Article 9 under the guise of their overbroad interpretation of remedies within the Parent Pledge Agreement. First, upon information and belief, Lenders caused Warshauer and Ritter to terminate certain long-term employees and advisors who raised questions regarding the impropriety of the captive board or communicated to MeiDu America about the Lenders' actions.

54. Upon information and belief, Lenders also began negotiating away valuable hedge contracts for unknown value causing financial detriment to the companies and making the long-term prospects of the business appear less stable.

---

[12] *See generally, id.*

55. Beginning in July 2020 and despite the MeiDuSubs ability to meet all obligations owed in the ordinary course of business in the foreseeable future, Lenders instructed Warshauer and Ritter to engage various consultants—paid for by the MeiDuSubs—to undertake efforts to reorganize the companies through bankruptcy in order to circumvent the protections afforded a debtor under the UCC. Such actions are not permitted anywhere in the Parent Pledge Agreement which confers upon Lenders limited rights to preserve and dispose of collateral in accordance with the UCC. Upon information and belief, the MeiDuSubs have continued to make all such payments to this day other than the balloon payment owed under the First Amendment.

56. Specifically, even if arguably permitted under the relevant agreements, Lenders and their agents do not possess complete autonomy to act for the companies. New York law prohibits a secured party from taking any action to dispose of collateral except as authorized under the UCC.[13] Under Article 9, a secured party must elect one of two options upon default with respect to the final disposition of the collateral: (i) dispose of the collateral in a commercially reasonable manner through private or public sale as prescribed by § 9-610; or (ii) strictly foreclose on the collateral under § 9-620.

57. Under § 9-610(b), a secured party may only dispose of the collateral through a private or public sale when "every aspect of a disposition of collateral, including the method, manner, time, place, and other terms" are commercially reasonable.[14] Moreover, a secured party may only purchase collateral under §9-610(c) at a public sale or, alternatively, a private sale but "only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed price quotations." Given the nature of the collateral, only a public sale is permissible.

[13] New York codifies the UCC. *See* N.Y. U.C.C. Law § 1-101, *et seq.* (McKinney).
[14] *Id.* at § 9-610(b).

58. Here, Lenders (directly and through their agents) undertook extensive actions to dispose of the collateral in an entirely different manner, one that is not consistent with the requirements of the UCC. This is an outcome prohibited by the UCC and beyond the authority of the Lenders to carry out.

59. Lenders seem to believe the onerous lending documents authorized them to move forward in a manner other than prescribed by law. Even if permitted within the lending documents (which is disputed), these protections are not waivable by a debtor or obligor before default. It is well settled that any agreements purporting to waive debtor protections are invalid and violative of Article 9.[15] Section 9-602 provides in pertinent part:

> Except as otherwise provided in Section 9-624, to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections: . . .
>
> (g) Sections 9-610 (b), 9-611, 9-613, and 9-614, which deal with disposition of collateral; . . .
>
> (j) Sections 9-620, 9-621, and 9-622, which deal with acceptance of collateral in satisfaction of obligation; . . .
>
> (k) Section 9-624, which deals with permissible waivers;
>
> (m) Sections 9-625 and 9-626, which deal with the secured party's liability for failure to comply with this article.[16]

60. Section 9-624, which delineates the narrow exceptions under which the rights of a debtor may be waived or varied, states in pertinent part:

> (b) Waiver of mandatory disposition. A debtor may waive the right to require disposition of collateral under Section 9-620 (e) only by an agreement to that effect entered into and authenticated *after default*.[17]

61. While parties may, by agreement, determine the standards by which the

[15] *Id.* at § 9-602.
[16] *Id.*
[17] *Id.* at § 9-624 (emphasis added).

performance of such obligations is to be measured, parties may not agree to grant a creditor complete autonomy with respect to disposing of the collateral.[18] As reflected by the official comment to § 9-602:

> [t]he context of default offers great opportunity for overreaching. The suspicious attitudes of the courts have been grounded in common sense. This section, like former Section 9-501(3), codifies this long-standing and deeply rooted attitude. The specific rights of the debtor and duties of the secured party may not be waived or varied except as stated. Provisions that are not specified in this section are subject to the general rules of Section 1-102(3).[19]

62. Here, the Lenders have attempted to enforce an agreed-on right that violates such a provision. To the extent that any loan document violates New York UCC § 9-602(g) by allowing a pre-default waiver of debtor's right to compel lender to dispose of collateral in a commercially reasonable manner, and to the extent that any loan document violates New York UCC § 9-602(j) by allowing a pre-default waiver of debtor's rights in the collateral, such provisions are non-enforceable. Accordingly, Lenders may not delegate such powers to others, such as Warshauer and Ritter here, to carry out actions that they do not have the legal authority to perform.

***vii. The UCC and federal public policy prohibits Lenders from taking control of or circumventing a debtor's bankruptcy protections***

63. On October 6, 2020, after initiating a process barred by New York law, Lenders caused Warshauer and Ritter to approve resolutions on behalf of the MeiDuSubs to file bankruptcy and consent to a highly expedited prepackaged Chapter 11 Plan of Reorganization that does not require a commercially reasonable sale of the assets.

64. State law controls Debtors' authority to file bankruptcy on behalf of an entity. As the Fifth Circuit recently determined:

> In absence of federal incorporation, that authority [to file the bankruptcy petition]

[18] *See generally Fed. Deposit Ins. Corp. v. Marino Corp.*, 74 A.D.2d 620 (1980).
[19] *See* Official Comments to N.Y. U.C.C. Law § 9-602.

> finds its source in local law . . . [s]tate law thus determines who has the authority to file a voluntary petition on behalf of the corporation . . . . If the petitioners lack authorization under state law, the bankruptcy court has no alternative but to dismiss the petition.[20]

65. As stated above, New York law prohibits Lenders from taking any action to circumvent Article 9 of the UCC, including any attempt to dispose of collateral inconsistent with the rights under § 9-620. Lenders (either directly or through their agents) did not possess the authority to attempt to take any action to dispose of collateral other than as permitted under state law.

66. Further, even if permitted by the relevant agreements and state law, federal public policy bars the Lenders from obstructing Debtors' right to initiate and control their own bankruptcy process through a pre-petition contract.[21] The Lenders are not equity owners of this business. They possess voting rights that afford them the ability to take actions pursuant only to their collection rights under the UCC. Accordingly, Lender did not possess the right to file the bankruptcy petition or control the process on behalf of the true debtors-in-interest by virtue of the rights secured by contract, but, even if they did, any further collection efforts should be stayed.

## CAUSES OF ACTION

### A. Count 1 – Declaratory Judgment Action

67. MeiDu America incorporates by reference all prior paragraphs.

68. MeiDu America seeks a declaration that, by filing for bankruptcy, the Defendants exceeded their authority under the relevant agreements and Article 9 by authorizing and engaging in a course of action to dispose of secured collateral in a manner other than (i) a commercially reasonable sale or (ii) strict foreclosure.

---

[20] *In re Franchise Servs. Of N. America, Inc.*, 891 F.3d 198, 206–207 (5th Cir. 2019) (internal citations and quotations omitted) (quoting *Price v. Gurney*, 324 U.S. 100, 106 (1945)).

[21] *See e.g., In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 261–65 (Bankr. D. Del. 2016).

69. MeiDu America seeks a declaration that the relevant agreements and Lenders' actions to date (either directly or through their agents) are void as to public policy to the extent it deprived Debtors from being able to initiate and control the course of their own bankruptcy.

**B. Count 2 – Dismissal of Bankruptcy Case, 11 U.S.C. § 1112**

70. MeiDu America incorporates by reference all prior paragraphs.

71. The Court should dismiss the Bankruptcy Case because the Lenders (either directly or through their agents) lacked the authority under the relevant agreements, New York law, and federal public policy to file for bankruptcy.

72. The Court should also dismiss the bankruptcy as one filed in bad faith. The Fifth Circuit has long held that a bankruptcy case may be dismissed "for cause" for a lack of good-faith.[22] A good-faith requirement exists largely (1) to prevent the "abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way" and (2) as a means to protect "the jurisdictional integrity of the bankruptcy courts" by making the Code only available to debtors with "clean hands."[23]

73. Pursuant to *Phoenix Piccadilly*, "courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights."[24]

74. In establishing whether a case was filed in bad faith, courts in the Fifth Circuit analyze, among other reasons, whether allegations are made of wrongdoing by the debtor or its

---

[22] *Humble Place Joint Venture v. Fory* (*In re Humble Place Joint Venture*), 936 F.2d 814, 816–17 (5th. Cir. 1991); *Little Creek Dev. Co. v. Commonwealth Mortgage Corp.* (*In re Little Creek Dev. Co.*), 779 F.2d 1068, 1072 (5th Cir. 1986).

[23] *In re Little Creek Dev. Co.*, 779 F.2d at 1072.

[24] *Phoenix Piccadilly. Ltd. v. Life Ins. Co. of Va.* (*In re Piccadilly. Ltd.*), 849 F.2d 1393, 1394 (11th Cir. 1988).

principal(s).[25] Courts have also examined whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.[26] A satisfaction of every factor is not a requirement in order to establish bad faith.[27]

75. As described above, Lenders' and their agents' actions caused a substantial hardship to MeiDu America. Such actions taken by the lenders via the Credit and Pledge Agreements are in direct violation of UCC § 9-610 and 9-620 and constitute bad faith.

76. Therefore, MeiDu America respectfully requests that the Court dismiss the above-captioned bankruptcy cases pursuant to §1112(b)(1) for "cause," or in the alternative, use its equitable powers under § 105(a) to dismiss the above-captioned bankruptcy cases.

77. Further, if the Court rules in favor on MeiDu America's declaratory judgment action, the bankruptcy cases must also be dismissed, because the board of directors for the Debtors would have lacked the authority to file chapter 11 for the Debtors.[28]

## CONCLUSION

**WHEREFORE**, MeiDu America respectfully requests that the Court (i) enter a judgment regarding the declaratory relief requested; (ii) dismisses the bankruptcy case; and (iii) grant MeiDu America such other relief as the Court deems just and proper.

Dated: November 3, 2020

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By: /s/ Jarrod B. Martin
Jarrod B. Martin
Texas Bar No. 24070221
Jeff C. Wigginton, Jr.
Texas Bar No. 24057521

[25] *In re Little Creek Dev. Co.*, 779 F.2d at 1071–73.
[26] *See In re C-TC 9th Avenue Partnership*, 113 F.3d 1304, 1309–1311 (2d Cir. 1997);
[27] *In re Little Creek Dev. Co.*, 779 F.2d at 1072–73.
[28] *In re Franchise Servs. Of N. America, Inc.*, 891 F.3d at 206–207.

Tyler W. Greenwood
Florida Bar No. 1011325
S.D. Tex. Bar No. 3575083
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
jeff.wigginton@chamberlainlaw.com
tyler.greenwood@chamberlainlaw.com

**BECKER & POLIAKOFF, LLP**

Samantha A. Lesser, pro hac vice
James J. Mahon, pro hac vice
Becker & Poliakoff, LLP
45 Broadway, 17th Floor
New York, NY 10006
212-599-3322
SaLesser@beckerlawyers.com
JMahon@beckerlawyers.com

***Counsel for MeiDu America, Inc.***